Board Meeting, December 6, audioconferencing Comnik Good morning, Your Honors. My name is Elizabeth Kristen, and I'm a lawyer at the Legal Aid Society Employment Law Center in San Francisco. I'm here with my colleague Patricia Shue. We represent the appellants in this matter, the Legal Aid Society Employment Law Center and the California Women's Law Center, two non-profit organizations. We would like to reserve five minutes for rebuttal, please. Because of this lawsuit, girls at Alhambra High School will play on brand new softball fields this year, 2008. Alhambra High School is not too far from Pasadena. Because of this lawsuit, girls at Alhambra High School will have a brand new locker room and team room. They'll have additional opportunities to participate in athletics. These remedies are exactly what Title IX, which has been on the books for more than 30 years, was designed to do to create equality for girls in athletics. The district court here recognized the excellent results the counsel achieved. He said that the results were remarkable, that we achieved the very relief that we sought, that the relief would benefit hundreds of present and future class members, and that it would send an important message to the community about the importance of athletics. Nevertheless, inexplicably, he slashed plaintiff's proffered load star by more than 50 percent. We believe that this was an error and should be reversed and remanded with specific instructions. Judge Tavrezian is no longer on the bench in the Central District of California. Therefore, we believe that the instructions from this panel will be particularly important. And we ask that this panel reverse with the instructions to set plaintiff's reasonable requested hourly rate at what was asked for in the briefs, to ask the court to compensate for all hours reasonably expended, including those spent on merits work and on work establishing the entitlement to fees, work that was done subsequent to the filing of the initial fee papers. What is it that we know that Judge Tavrezian didn't know? I mean, he is in a uniquely qualified position to evaluate the work of lawyers. He dealt in a hands-on way in the mediations. I read his memorandum. I've read it several times. I'm not sure there's a misstatement in the law there. We don't have to do an hourly or a line-by-line evaluation. He gave a matrix for those, for examples of where he thought there was too much time spent or where he thought, and he explained why he thought the rates were not those of class-action lawyers who fight about the national price of sugar in price-fixing cases or whatever. It seems to me that he did everything that a district judge could and should do, short of making the attorney fee issue the real issue and point of the litigation, the second trial that we always euphemistically refer to, that we want to avoid, but we always seem to be embroiled in. Well, I certainly appreciate your remarks, Your Honor, and I do believe district judges are in a difficult position, and I realize that there is a certain amount of deference that this Court pays to factual findings that the district court makes. I would point the Court, though, to the Gates case that suggests that when a district court employs a meat-ax approach, as the district court did here, that that subjects the opinion to heightened scrutiny. Moreover, even under the abuse of discretion standard, we believe that Judge Tabrizian made clearly erroneous factual findings and erred as a matter of law. In fact, he did not set a lodestar. He did not set reasonable hourly rates. We were unable to come up with any attorneys' fees case where the actual hourly rates were not established. We're left, and the panel, unfortunately, is left in the position of not knowing whether Judge Tabrizian took the requested reasonable hourly rates of, for example, Ms. Hsu, who's a 25-year civil rights lawyer, and cut it in half so that she would be compensated at a rate less than a first-year associate at any law firm in Los Angeles, or whether he slashed some of those rates, or whether he awarded rates but slashed hours. Should Judge Tabrizian have gone through as to each lawyer individually, or can he deal with a blended rate? Your blended rate was $327 an hour. I believe the case law is clear that the rates have to be established with respect to each lawyer because, as the lawyers are entitled to rates of comparable attorneys, of comparable skill, experience, and reputation, I don't believe that a blended rate would have been appropriate. Moreover, it's not clear that Judge Tabrizian established a blended rate here. That certainly doesn't appear anywhere in his order. It's just simple math. You figure out the number of hours and the total fee application, and you can figure out what the average, it's just reverse engineering. You figure out what the blended hourly rate is, and it's 327 hours by my calculation at 2,066 hours. Well, Your Honor, he may have established a blended rate. That's not apparent to me on the face of the order. But the other problem with respect to rates is that he failed to establish what they were at all. It's unclear from the order what he thought the rates would be, and there was certainly credible and excellent evidence of what the reasonable hourly rates were for these counsel. But what he indicated was, it seems to me, that I think the hourly rates are those in the, would be those in the community, not the average rates in the community, not Gibson, Dunn, and Crutcher for Enron or what have you. I mean, that's what I mean. When someone makes a decision to bring declarations, they are advocating a point, and they're advocating a point that this is class action litigation, and it's dubious as to whether class action was, whether I would have granted class action status as this being the superior method of resolving what was relatively a small community issue that was handled very, very well. But he said over and over again in his decision that he thought it was the average rates in the community. And the other thing I will note is that 35 percent of all the trials that occur, civil trials that occur in federal court in this country are civil rights cases. Judge Tavrezian, I believe, knows civil rights cases and knows that community, but nobody submitted an application, evidence to him of a lower rate. He just looked at it and said, using the Goldilocks approach, this is too hot, this is too cold, this is about right. And it seems to me he did the best he could with what he had, and he stated the law very accurately. Well, Your Honor, I don't agree that the Goldilocks approach is an acceptable way for the district court to set rates. The district court must award rates, according to Supreme Court law, according to the Blum case, must set rates for lawyers of comparable skill, experience, and reputation. And the evidence submitted here was quite a bit more than just declarations, although certainly we assert that those declarations that were provided were sufficient evidence of plaintiffs' hourly rates. The plaintiffs also submitted a prior fee award from the year before from Judge Ilston from the Northern District of California, setting rates for some of the exact same billers from the Legal Aid Society Employment Law Center. The district court apparently rejected this award as out of hand, but this court has said that it's an abuse of discretion for a district court to simply reject those types of prior fee awards without considering them as sufficient evidence of reasonable hourly rates. Plaintiffs also submitted a survey from the National Law Journal about rates in Los Angeles, and our rates were within the range of rates that are charged by firms in Los Angeles. The case that we cite in our 28J letter, Committee to Journalists v. City of Redondo Beach, sets rates in the Central District of California for nonprofit lawyers at rates considerably higher than those requested here. It sets rates for Robert Rubin of over $600 an hour. He's a 1978 law school graduate. It sets rates for a Bolt Hall graduate, 2002, of $295 an hour. These are rates in the relevant community. We assert that the evidence before Judge Tabrizian with respect to rates was quite sufficient under this circuit's longstanding precedent and the Supreme Court's precedent with respect to rates, and that those rates could have and should have been awarded. The district court also, I respectfully disagree with you, Judge Layton. I don't believe that the order does reveal what rates the district court established. He said he thought the rates were too high, but what he did was he slashed the proffered load star by more than 50%. He never said what hours were reasonably expended. He never said what reasonable rate should have applied. Certainly a district court has a number of tools at its disposal and is not required to conduct a line-by-line review of billing records. The plaintiffs presented a fully documented fee claim, and as the Supreme Court said in Hensley, excellent results normally require a fully compensatory fee. So we submitted the contemporaneous billing records. Those records established the hours that we spent. We cut 15% of our hours in exercise of billing judgment, and we submitted sufficient evidence of hourly rates. Yet the district court failed to set a load star. That procedural failure alone is enough to require remand, and this court has certainly done so in McGrath, in Tudor-Saliba, in a number of cases. Part of the problem is that it does create difficulty for meaningful appellate review when it's not clear what hours the court found reasonably expended, what rates the court applied. But the court also erred with respect to awarding zero, essentially a 100% cut for hours that were requested subsequent to the initial fee motion. Those hours were requested in the declarations that accompanied the initial fee motion. There was an estimate provided, and in the reply briefs, those hours were requested and then again requested in the 59E motion. Yet the court, in an error of law, said that plaintiffs failed to request them, failed to provide reasonable evidence. We believe that that was a clearly erroneous factual finding. Moreover, as a matter of law, this circuit has been clear that time spent for entitlement to fees is compensable. Otherwise, it... He deleted that as well, right? He deleted it by 100%, Your Honor, which included significant merits work that was done subsequent to the filing of the initial fee motion, which was filed in early January. The final approval hearing happened at the end of January, so certainly we couldn't have submitted those bills with our initial fee motion. We're in the middle of a very long week, so I'm sorry I don't remember this, but was there any argument made about what the school district could afford? And I'll just note for the record that both, I think Judge Trevesian and I live about two miles from each other and very close to Alhambra. So, I mean, is there any argument that the school district... I mean, weighing in the fact that this might not be the wealthiest of school districts, that to pay such a large fee award might be very... as well as requiring all these new facilities might be very difficult for the city. Yes, Your Honor, the district did make a special circumstances argument and suggested that However, Judge Trevesian clearly rejected that in his order. He said this is not a special circumstance. School districts are public entities and they are obligated under the Civil Rights Attorneys' Fees Act, just like every other defendant, to pay reasonable attorney's fees. And he also relied on Judge Ilston's finding in Lopez v. San Francisco Unified School District in determining that the fact that the school district was the defendant was not a reason to reduce the fee award. And that's appropriate because this is a civil rights case, let's not forget. And civil rights enforcement is critically important to this country. And Congress, in establishing the Civil Rights Attorneys' Fee Act, held that private attorneys general who bring civil rights cases, especially cases where they're not money cases. This was an injunctive relief case. Our clients were not seeking money for themselves. The money that's awarded in fees does not go into my pocket. It goes to the two organizations, the Legal Aid Society and the California Women's Law Center, to support their longstanding missions of enforcing civil rights cases and bringing additional cases on behalf of the poorest and the most disadvantaged in our community. So while we're certainly sympathetic to the fact that school districts throughout California have financial difficulties, we don't believe that under the Supreme Court's law, under this precedent, and under good public policy, that they should be exempt from civil rights laws. The evidence in the record about the importance to girls in participating in athletics can't be understated. This is critically important for girls, especially girls from poor school districts, especially girls of color. It's really important that they have an opportunity to participate in sports because it creates all kinds of benefits. The benefits are legion. There are health benefits. Dropout rates are less. High school dropout rates are less. So the importance of sports for girls is really critical. Title IX has been on the book for more than 30 years. And these two defendants were on notice that there were problems at their school. There was notification made by the softball coach to the district time and time again that there were Title IX problems with respect to the way the girls were relegated to play on a dirty and dangerous softball field. And the city, too, was on notice. There was a community member who testified before city council when this Moore Field renovation, this million dollar baseball field, to create a mini Dodger Stadium for the boys' baseball team. When that was before city council, a community member said, you know, this seems like it's a Title IX violation. What about the girls? Where are girls going to play softball? Do you want to save some time? Yes. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm John Allen for the Alhambra School District Defendants. We've agreed to split the time, our 20 minutes. Just for the record, I grew up near Alhambra, but we didn't have enough money to cross the border. I always thought it was an exotic place. To answer a previous question, we did raise the argument that the Alhambra School District had very limited funds, many of which would be committed to doing the injunctive relief that we agreed upon in the settlement. And Judge Tabrizian rejected that argument out of hand. In fact, throughout the litigation, Judge Tabrizian tended to side with the plaintiffs and hence we settled the case. But clearly there was no prejudice or no bias on the part of Judge Tabrizian to rule against the plaintiffs on their fee application that would ... It doesn't really ... I mean, I've read his two orders and I respect and admire Judge Tabrizian immensely. In fact, he was one of my mentors when I went on the district court. And I don't ... I can't find the articulated basis for a flat 50% reduction. Plus, I think it's clear error to not award fees on fees under our law in the Ninth Circuit. And the school district's expert came up with a higher fee. That's correct. But the judge makes clear in his order that he did not use our expert's declaration in making his factual findings. So what did he find? What was his finding on rates? And what I'm missing here, having done this myself, is the Cunningham and Kerr analysis, finding the lodestar and then weighing all the factors. That's typically what we would do. Well, the easiest way to determine a lodestar is to set out the hourly rate, to set out the reasonable number of hours and the reasonable hourly rate and do the math. This case presents the issue as to whether that is absolutely required in the Ninth Circuit. Whether the judge has to do the math or whether, as Judge Layton said, if he sets forth the factual underpinning, does he have to go back and show his work on renaming? Okay, but what did he find with the appropriate rates? What finding of fact did he make? He found that if these attorneys were entitled to the fees they claimed, they should have billed far fewer hours because they should have been more efficient. He found if they were entitled to this number of hours, Your Honor, he did not set it out. I know. That's problematic to me that he didn't make a finding as to the rate. It's problematic only if the Ninth Circuit requires the district court to show its math. Or can it follow prior Ninth Circuit precedents such as Gates v. Duke Magian and the U.S. Supreme Court decisions on this issue and simply give a brief, concise, but detailed description of why the rates are being cut? Gates v. Duke Magian does allow the percentage cut for the judge to look at the total fees claimed and determine that they're double what they should be because the rates were too high and the hours were too much. Let me ask this question. Would this case be any different right now if Judge DeVriesian would have said, I think, at $327 an hour, the blended rate of the timekeepers, that this work could have been done within, is equal to six months of full-time work, three depositions, a couple of motions, and negotiations and mediation? What was that, 30 drafts? That a lawyer, 60 drafts, maybe, 50 or 60. I think that's a 50-page settlement agreement. Oh, 50 or 60 page, you're right, yeah. With approximately 30 drafts. How many drafts? I think approximately 30. 30, I would cut those in half. But I mean, would it be different if this, because efficiency and rates are supposedly on opposite ends of the same seesaw. The person who's getting $500 an hour, his or her attitude is one riot, one ranger. And somebody who's newer and less efficient has a lower rate and they're going to be more hours. And that's just what the marketplace dictates. But if he had said, I think 1,333 hours was enough to get a highly paid, highly compensated lawyer to get this work done, would we be here? Yes, we would, because the plaintiffs are also arguing that there were erroneous findings of fact, both as to the rate and as to the number of hours. So if the court had spelled it out, the arguments might be a little more concise. But our position is, the court is not legally required to pick a number and to pick a number of hours. But what he's supposed to do is give us something that we can meaningfully review. So how can we, I mean, how do we meaningfully review this fee order when it appears he just, yeah, he did say that there was duplication of effort and he didn't like the idea that there was a San Francisco firm that was increased travel time. I think that probably was part of what they had reduced on their own. But then he just cuts it 50%. To me, that almost borders on arbitrary. It would if he hadn't backed it up with a 22-page opinion, which goes through precisely his reasoning, both for cutting the hours and for cutting the hourly rate. And I believe if you look at his opinion, it's clear he's saying, I'm not going to pick $327 per hour. I'm going to say it's within a small range and the reasonable hours are within a small range. And when you multiply those two together, you get the award, which is 50% less than the requested load star. He's letting the parties look at it either as they were worth that much per hour, but then they billed way too much. I have a question. You folks are in one law firm. No, counsel for the city of Alhambra is here as well. And we're splitting the argument 10 minutes each. But you've got three people? What law firm are you with? Jabot, Mahan & Briscoe. And I do have my colleague, Julie Mullane, with me. So what are you billing the city? We're currently billing 175, the school district, not the city. The school district. At the time of this litigation, we were billing $155 an hour. So you're just starting out in life, huh? No. No, Your Honor. This will be my 20th year. And our firm was once part of Shield & Smith. The partners go way back in Los Angeles handling this type of litigation as well. Who drafted these settlement agreements? I believe they were drafted in such a way that they went back and forth so that it didn't really matter who originally... I mean, who provided the first draft? I don't know, Your Honor. You don't? No. I apologize. Isn't that... Well, it is if this court is going to go back over the bills line by line. You make a deal, and you're the lawyer. You want to do the draft. Because you know what you're writing. I think it's fair to say both sides spent equal time reviewing the drafts as it went back and forth to look at changes. I'm also aware that Judge Tavrizian was in the settlement negotiations several sessions and was also available by phone for several sessions, which also shows that he knows this case respectfully better than the panel today. Let me say, and I agree with Judge Wardlaw on the fee-on-fees issue. I think that's a serious problem. Yeah. But the range... We're unanimous on that. The range is 1,033 hours at $327 at the high end versus 2,066 hours, full credit for hours, at $163.50, which is comparable to what the people on the other side of the bargaining table were making. That's correct. That's the range. And Judge Tavrizian, it seems to me, says in his opinion, these are my reasons for coming up with a number. And where somebody wants to say I wound up in the range is fine with me. Right. Correct. And I believe that's what his opinion shows. And if there is a remand, it would really be saying, go back, show your work, and then it will be acceptable to the Ninth Circuit. Well, in certain cases, it's going to be second litigation. You've got a new judge. I mean, it's going to be second litigation. Well, you know, we could send it to Jams, where Judge Tavrizian is, and get him started on his new career. Well, Your Honors, I would request that if there's... I think he's probably charging at least $500 an hour for that. I saw those fees. Going to San Francisco, just going up there is $1,100 an hour. Your Honors, I would suggest if there is reversal on the fees on fees issue, which I think the court below found adequately that there was insufficient clear evidence to support that request. But if there is a reversal on that issue, it should only be on that issue, and that the original lodestar chosen by the trial court as to... Well, how much your own expert thought was worth more money? Well, Your Honor, I frequently had juries come in... Well, once. Had a jury come in for less than I suggested to them was the value of the case. It happens. The judge's value is different as opposed to our experts. And I'd respectfully like to turn over the rest of the time to counsel for the city. So, this is with another law firm or an internal counsel with the city? Correct. Separate law firm. So, isn't this duplication? I mean, isn't this exactly what he was cutting their rates for? Well, we did one brief, Your Honor, but we do have different... We have three lawyers up here, presumably. We do have different... They have five in the audience, Your Honor. Well, I'm sure they're not charging. Well, we'll have to find out. Although, you will find out, because now, as a result of this, you're probably going to have another fee request for fees on appeal. Well, Your Honor, if I'd like to address a couple of issues on that score. With respect to the fees on appeal, the court made a clear finding in his order on the motion, the Rule 1, inadequate articulation of what the fees were, what the work was done that was claimed with respect to that fee, the $106,000 for three days' worth of work. The court made very clear in his order that the plaintiff didn't meet its burden in demonstrating the amount of fees that were properly chargeable. So I would suggest to you, Your Honor, that it's not appropriate to remand the case for a fee-on-fee award. Had plaintiffs properly requested and documented fees, we might be in a different position. I probably couldn't make that same argument. That's not what happened below. The other point that I think is important in terms of how many lawyers there are at this table, I represent the city of Alhambra. I don't represent the school district. I never have. I represent cities. And the city was sued as a separate defendant for a separate legal basis and has a right to have separate legal counsel. Plaintiffs' counsel had five lawyer firms, I think, on its different pleadings at one time or another, whereas the city has had one firm and the district has had one firm. Ms. Pfeffer, who was handling the matter below, was receiving $225 an hour for her services. That's what I'm receiving for my services today. There's about $1,500 worth of lawyers sitting in the audience based upon the rates. I'm a civil servant, you know. Well, actually, Your Honor, I'm in a private law firm. You are? I certainly am. What's the name of the law firm? Jones and Mayer, Your Honor. Jones and Mayer? Jones and Mayer. Is it irrelevant that they have people who are here, unless they're billing? I mean, that's a totally irrelevant thing. Well, Your Honor, with respect, I don't think it is irrelevant because it demonstrates the fact that It demonstrates nothing. That they're here, they could just be interested. It's totally irrelevant and you're really wasting your time. I'm not trying to do that, Your Honor. I apologize. I know. You probably have other more important things to argue. I do. The court's order lays out the entire explanation for why the fee order was reduced and I want to point out that the Gates case specifically says that when faced with a massive fee application, the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure. Don't they have to go through those Johnson factors or Kerr factors? The Kerr factors. I think the court laid out that he did that, Your Honor. He talked about rates in the community. He talked about the complexity of the litigation. He talked about the skill and experience of the lawyers. He talked about the result. He did all the factors and those are all explained in the case. I think to say that a district court judge has to do it exactly the way that the district court judge did it I have to tell you this. I was the district judge that was reversed by Shirley Huffstadler thirty-five years ago on the Kerr factors, which I thought was a terrible opinion. And I think it probably still is, Your Honor. Judge Gregersen's experience in the district court explains why me as a district court currently am twitching up here a little bit about Judge Tavresian's efforts and how they're being regarded. In that case there with Kerr, that was a totally crazy, well, I see that lawyer once in a while. He's a Harvard man, so he gets very upset if I would say worthless case. So strike that word. Well, Your Honor, I think It's different, you know. And I appreciate that. But I think the question really is, is there evidence in the record that supports the reduction? And I think there clearly is. There's a declaration from Ms. Pfeffer that she's charging $225 an hour. There's a declaration from the district's counsel that it's charging $155 an hour. There's a declaration from Dick Terzian, a lawyer experienced with 40 years of practice in this area, that his absolute top rate in 2005 is $300 an hour. Well, something's wrong with the guy. Maybe he better reevaluate because you don't see that anymore. Well, I beg to differ with you, Your Honor. All clerks go out, you know, to work. They're probably billing $400 an hour. Well, Your Honor, I clerked in this circuit 17 years ago. And I am the city attorney for the city of Costa Mesa. I charge $165 an hour for my time. Who did you clerk for? Judge Fernandez. Oh. Fernandez? Well, he taught you frugality. I think the point is, Your Honor, that it isn't what Loeb and Loeb charges and it isn't what the top firms charge. It's what's the prevailing market rate in the community. And there's a whole range. I think the range... Yeah, people have been doing this work for probably their entire professional lives. So have I, Your Honor. If you didn't have them, there'd be nobody to bring these lawsuits. I'm not saying that they shouldn't get paid, Your Honor. I'm saying that the rates they're paying are excessive. This case, as pointed out by Judge Tabrizian, was not complex. It was a settled case. In fact, the city paid $500,000 when it doesn't even own the field. It took them filing this lawsuit to get the city of Alhambra and the school district to act. And one would think, you know, Title IX went into effect in 1972. Why does it take them having to file this lawsuit and do all this work and spend hours and hours in negotiations to get the city of Alhambra and the school district to do what it should have done in the first place? Well, with respect, Your Honor, the city of Alhambra has never been determined to be liable in any way. We settled this case as a way of getting our peace. We opted to buy our peace solely because we had provided money to the school district to renovate a field. Not because the city had done anything wrong, but it agreed to pay an additional $500,000 to buy its peace, not to have to re-litigate and re-litigate and re-litigate these issues. That's why the final issue was submitted. Why did you provide those equal facilities back when? Well, Your Honor, we're talking about school district facilities. They aren't owned by the city of Alhambra. There's never been a determination that the school district... I represent the city of Alhambra, which tried to buy its peace by putting up $500,000 to be used to build a softball field, when it really has no obligation to fund recreational facilities owned by anybody else. It was brought into this case purely because it had provided some funding for a field that it provides some community use of. That sounds like a pretty smart strategy to me, by the plaintiffs. I mean, they got the field and got the city to participate. Indeed, Your Honor, and the city's also paid its fair share of attorney's fees already. That's what we're here to talk about today, but the point of the matter is that there's never been any liability determination. We settled this case, and the judge took into full account the result obtained, the skill and competence of the lawyers. I can tell you with a high degree of certainty that no lawyer with my background in this type of litigation could, with a straight face, ask a public entity client to pay $500 an hour, $470 an hour, $400 an hour, or even the $275 an hour for a five-year associate. For what? Ms. Kristen was billed at $275 an hour. I just missed the last one. She was a five-year associate, Your Honor. And in this community, you might be able to do that if you're with Irela Menela like I was when I first finished my clerkship, but that's not the community we're talking about. That's not... You're saying Los Angeles isn't the relevant community. You're saying Pasadena, Alhambra would be the relevant community. No, I'm saying, Your Honor, that the top five law firms in the nation are not the relevant community. We don't get to choose just the high firms that are in a position to charge excessive rates because they have a big name, lots of expertise in copyright or trademark or whatever the issue is, insurance law, in the case of Irela Menela. What we're talking about is what is the market rate... No, Irela Menela does... Well, insurance litigation is what I did there, Your Honor. No, I went there and applied for a job out of law school, but they didn't hire me. But you're right, they have a tax practice as well, Your Honor, but the point is those are very specialized practices. What we're talking about here... I went to law school on tax, but they still didn't hire me. You know why? And they should have, Your Honor, frankly. No, no, I'm glad they didn't. I've been a slave somewhere. We believe, Your Honor, that... They're nice people. I like them. They just... They had an office that was, oh, less space than where the bleachers are over there. And the only space they had left for me would be under the table of the library. The point I'm trying to make is that very experienced lawyers that do this kind of work in this market, and I'm not saying Los Angeles is not the relevant market, but I do this work in this market. And I couldn't, with a straight face, charge $275 an hour, much less $470 an hour. My clients wouldn't pay it. I couldn't justify it to a court. It's what is the prevailing market rate in the community. And as you pointed out, 35% of the civil rights... of the cases that are handled in the district courts here are civil rights cases. I think the city of Alhambra ought to give you a raise. Thank you, Your Honor. I appreciate that. Nonetheless, they're not going to. So the market rate is what the market rate is, and I think there's nobody more familiar with that than Judge Tavrizian. He provided substantial documentary evidence of what that rate is. He made specific findings in the order, calling out $250,000 in unreasonably duplicated billings at the rate requested. That combined with his observations about the unreasonable hourly rate and the plaintiff's failure... I think we got your argument. I think you're... Is my time up, Your Honor? Thank you very much. Let me ask you all a question, huh? And you can caucus on this. What if the three of us got together and came up with figures for you? Would you accept them? Just think about it. I mean, you know, this thing goes back, it's going to go back to another judge. You don't know who you're going to get. At least you know who you're getting here. And so this could go on and on and fees on fees and all that. Okay? Thank you, Your Honor. Essentially, that's what plaintiffs and appellants are asking this panel to do because Judge Tavrazian is no longer on the bench, because we think that it's not going to be a wise use of everyone's time to re-litigate the entire fee application in front of a new judge. We're asking this panel to provide instructions and to set a reasonable hourly rate. Now, this discussion of rates that are charged by public entities to their clients under the special deals that they have for repeat business is not the prevailing law in this circuit. Under Trevino v. Gates, this circuit has clearly said that the rates charged by defendants are not the rates that the plaintiffs' counsel are bound by. What the Supreme Court has said is that rates are set by the rates in the prevailing community for lawyers of reasonably comparable skill, experience, and reputation. I submit that the lawyers representing these two nonprofit organizations and this class of plaintiffs are worthy of the same rates that are charged by lawyers at the best law firms in Los Angeles. And indeed, another central district judge agreed in a similar case in Committee to Journalists, set rates for nonprofit lawyers, matching them to Quinn Emanuel, rates that are even higher than the rates that are being requested here. Which district court was that? That was the Committee to Journalists case. It wasn't a district judge name I was familiar with, but it's in our 28J letter, and I can get the judge's name for you. What the defendants are essentially suggesting is that we turn 20 or 30 years of fees jurisprudence on its head, that we adopt a method that the Northern District of California has put forward in the Albion case, where they say we shouldn't follow Supreme Court precedent with respect to lawyers of reasonably comparable skill, experience, and reputation. Instead, we should come up with some rate that minimally competent lawyers would accept to do this type of work. We don't care what lawyers at the big firms are going to charge. And that's simply not what the prevailing case law is. Moreover, it's bad policy. There's no reason that lawyers who dedicate their lives to civil rights work, who work at organizations that enforce the rights of the least represented in the community, should have their work undermined because the rates charged by the largest law firms in Los Angeles continue to skyrocket. Let me ask you the same question I asked counsel. If Judge Tavrezian had said, I think one highly compensated lawyer working for the plaintiffs in this case, working full-time, I mean 40 hours a week or whatever, for six months... They usually work 80 hours a week. Well, whatever, could have accomplished this result in taking the three depositions, doing the two motions, and would you still be here objecting to the numbers that he had adopted? Yes, Your Honor, because that's not the standard that this district court should have adopted. This circuit's precedents have been very clear on these questions of rates and hours. The counsel for the appellees seemed to say that the district court doesn't have to do the math, but in fact the district court does have to indicate rates. I just asked you if the judge had said 1,033 hours at 327... And I'm assuming 1,033 hours is half a year. I mean, I had a few years where I put in 2,000 hours, but it was usually on a plane going somewhere, easy hours, relatively speaking. I mean, 2,000 hours is a lot of hours. 1,033, six months' work, $327 an hour. If he'd have said, in my judgment, having worked with these people, six months, one lawyer probably could have done this and obtained this remarkable... And I do not mean to denigrate the quality of the work or the merit  in any way, shape, or form. But we've got a thing called a vanishing trial here that federal judges all are worried about, and we're worried that we're going to be extinct and a dinosaur, and the reason most people give is the transactional costs are going through the roof that litigants don't want us anymore. They'll go to the private, they'll go to jams, they'll go to get their justice somewhere else. And that's a concern to me. Well, Your Honor, I would submit that our initial documented load star, we billed about 2,000 hours. This number of hours was less hours than the appellees billed for two years of work. So I don't believe you can say one lawyer working full-time should have been able to take care of this case. My understanding is that's not how cases are staffed at major law firms. They have a partner, they have an associate, they have a junior associate. And non-profit law firms, like our organization, are entitled to staff this case in the way we believe is the most efficient and the most effective for our clients. And that's what we did here. We brought our considerable expertise in Title IX work, in class action work, to bear on this case. Now, appellees have admitted that this is a complex case. They said it in the motion for preliminary approval, which they drafted. Their lawyer below said it in the appearance before Judge Tabrizian, in which Judge Tabrizian initially said, I'm going to grant class certification, why don't you all stipulate? $100,000 in a motion for class certification that the defendants could have completely avoided by stipulating to class certification, which was a foregone conclusion in front of Judge Tabrizian. He did, in fact, grant that motion within minutes of the appearance. So we believe that a lot of the fees and a lot of the hours were necessitated by the defendant's own action. I would submit one point with respect to the fees on fees. If you simply remand the fees on fees without setting a rate, we're going to be back into this exact same problem. I believe that the rates that we've requested are reasonable, they're comparable to lawyers in the relevant community, and nonprofit lawyers are entitled to the same rates that are charged by private lawyers in the relevant community. The relevant community here is Los Angeles. I would point... How about the travel time? I'm sorry, Your Honor. The travel time. Judge Tabrizian did not appear to discount for travel time. Certainly, defendant's expert called travel time as one of the issues he was concerned with. He thought it should take an hour to fly from San Francisco to Los Angeles and an hour to fly back, and that's certainly nobody's experience in the days of modern air travel. But it doesn't appear to be the reason that Judge Tabrizian gave, and Judge Tabrizian's reasons were not tethered to the 50% reduction. He gave essentially three broadly articulated reasons. He said that the case had potential duplication of effort. Well, the billing records that were called by the defendant's own expert, he didn't suggest that all of that time being... The defendant's expert suggested a one-third reduction, and Judge Tabrizian did a 50% reduction. Would you be satisfied with the one-third reduction by the expert on the other side? I wouldn't, Your Honor, because I don't believe it was actually a one-third reduction based on the factors that Judge Tabrizian singled out. He singled out basically three particular things, non-billable and partially billable tasks. That is less than $20,000, even if you eliminated that time. Then he singled out potential duplication, and the expert from their side, whom we challenged, but even assuming that you accepted that expert, said that there should be only a 10% reduction for potential duplication. Then he singled out conferencing time, and their expert said that conferencing should be no more than 7% of the total lodestar. That's an arbitrary conclusion, and indeed this court in Davis said that a lodestar that had 38% of its lodestars conferencing was acceptable. In Keith v. Volpe, the court said that 25% of the total lodestar for conferencing was reasonable. So we disagreed with the specifics of what the expert recommended, but we certainly don't believe that any of those reasons, taken separately or together, justifies a more than 50% in our proffer lodestar for three years of documented work with excellent results by some of the finest lawyers in the country. Two of the lawyers on our case clerked for the Ninth Circuit. Three of the lawyers who worked on our case have appeared before the United States Supreme Court. These are excellent lawyers doing excellent work, working for non-profits, making salaries that are a fraction of what lawyers are making in the private sector. And lawyers are doing it because of their commitment and dedication to civil rights. The Fee Award doesn't go into my pocket. The Fee Award goes to the organization. It continues the work, the wonderful work that we did on behalf of the girls in the city of Alhambra who really deserve a tremendous amount of credit for their bravery in coming forward and bringing this issue to the attention of the district and the city, an issue that they should have been well aware of. I'm happy to speak about this further, Your Honor, if you have any other further questions. Well, who was the judge that made the Fee Award in Keith v. Volpe? That was you, Your Honor, I believe. You did a good job. That was in my other life. All right, I guess we've got more business, huh? Thank you, Your Honor. Now we're going to the interesting stuff.
judges: Pregerson, Wardlaw, Leighton